UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFREDO HERNANDEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>DTI GMBH,<br><br>        Defendant. | Case No. 21-cv-04065-JST<br><br>**ORDER DENYING IN PART, GRANTING IN PART MOTION TO DISMISS**<br><br>Re: ECF No. 53 |

Before the Court is Defendant DTI GmbH's ("DTI") motion to dismiss. The Court will deny the motion in part and grant the motion in part.

## I.    BACKGROUND

### A.    Parties

On June 9, 2023, Plaintiff Alfredo Hernandez filed his second amended complaint ("SAC") in this action against DTI, whom he claims fails to identify its product, Dr. Tobias Omega 3 Fish Oil Triple Strength dietary supplement, by its common and usual name. Rather than fish oi, Hernandez claims the product contains "a lab-synthesized solution resulting from a chemical process in which an industrial solvent and ethanol are used to alter and substantially transform otherwise unmarketable fish waste into a consumable product known as a fatty acid ethyl ester, which Defendant deceptively pawns off on the unsuspecting public as fish oil." ECF No. 49 ¶ 6. Hernandez claims that through this obfuscation, DTI has "deceived [him] and members of the class," thereby "depriving them of a consumer's most basic right to make an informed purchasing decision." *Id.* ¶ 65.

Hernandez filed his first amended complaint ("FAC") in this putative class action against Defendants Mimi's Rock, Inc., Vitalabs, Inc., and DTI in September 2022. ECF No. 28. MRI and

Vitalabs subsequently moved to dismiss Hernandez's FAC for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. ECF Nos. 39, 42. In granting those motions to dismiss, the Court concluded that Hernandez failed to establish that MRI and Vitalabs purposefully directed their activities at California, and therefore the Court lacked personal jurisdiction over either Defendant.

**B. Scientific Background**

Before delving into the specific claims that Hernandez levies, a brief discussion concerning fish oil, molecular chemistry, and Omega-3 fatty acid ethyl esters is in order.[1]

Omega-3's "are polyunsaturated carboxylic acids that provide numerous health benefits to the human body including a variety of critical organs and systems." ECF No. 49 ¶ 23 (citing *Omega-3 Fatty Acids*, National Institutes of Health, Office of Dietary Supplements (July 18, 2022), available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer) (permalink: https://perma.cc/VB4N-FAXZ[2]) (last accessed August 23, 2024) ("*Omega-3 Fatty Acids*"). Although 11 types of Omega-3's exist, "the three most important to human physiology are alpha-linolenic acid ("ALA"), docosahexaenoic acid ("DHA") and eicosapentaenoic acid ("EPA")." *Id.* ¶ 24. The human body can only convert ALA into EPA and then to DHA in small amounts. *Id.* ¶ 23 (citing *Omega-3 Fatty Acids*). Therefore, the only practical way to increase one's levels of EPA and DHA is to increase the dietary intake of Omega-3 fatty acids. *Id.*

Notably, only in 2019 did the Food and Drug Administration ("FDA") approve qualified health claims relating to the consumption of EPA and DHA and its positive effect on human

---

[1] Throughout the SAC, Hernandez includes detailed information regarding the processing of fish oils for packaging in dietary-supplement capsules. The referenced materials—a compilation of published scientific journals, scientific textbooks, mass spectra, and compound summaries of various molecules, among others—are found in 38 footnotes appearing in the first 49 pages of the SAC. *See generally* ECF No. 49 at 6–22. While the Court is neither an expert in organic chemistry nor the commercial fishing industry, it has been careful to apply its own plain-language reading to the materials and to review all documents in the light most favorable to Hernandez. Where the text of the referenced material differs from the factual allegations in the SAC, the Court, as it must, considers the referenced material in full. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (holding that courts "need not accept as true allegations contradicting documents that are referenced in the complaint.").

[2] The Court uses Perma.cc links to ensure that content retrieved from the internet remains available to readers of this order even if the original internet content is taken down.

2

health.  *Id.* ¶ 27 (citing *FDA Constituent Update*, U.S. Food and Drug Administration (June 19, 2019), available at https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-new-qualified-health-claims-epa-and-dha-omega-3-consumption-and-risk-hypertension-and[3]) (last accessed August 23, 2024).  Specifically, the FDA stated that it would not object to the use of the following qualified health claims regarding EPA and DHA Omega-3 fatty acids in food or dietary supplements:

> 1. Consuming EPA and DHA combined may help lower blood pressure in the general population and reduce the risk of hypertension. However, FDA has concluded that the evidence is inconsistent and inconclusive. One serving of [name of the food or dietary supplement] provides [  ] gram(s) of EPA and DHA.
>
> 2. Consuming EPA and DHA combined may reduce blood pressure and reduce the risk of hypertension, a risk factor for CHD (coronary heart disease). However, FDA has concluded that the evidence is inconsistent and inconclusive. One serving of [name of the food or dietary supplement] provides [  ] gram(s) of EPA and DHA.
>
> 3.a. Consuming EPA and DHA combined may reduce the risk of CHD (coronary heart disease) by lowering blood pressure. However, FDA has concluded that the evidence is inconsistent and inconclusive. One serving of [name of the food or dietary supplement] provides [  ] gram(s) of EPA and DHA.
>
> 3.b. Consuming EPA and DHA combined may reduce the risk of CHD (coronary heart disease) by reducing the risk of hypertension. However, FDA has concluded that the evidence is inconsistent and inconclusive. One serving of [name of the food or dietary supplement] provides [  ] gram(s) of EPA and DHA.
>
> 4. Research shows that consuming EPA and DHA combined may be beneficial for moderating blood pressure, a risk factor for CHD (coronary heart disease). However, FDA has concluded that the evidence is inconsistent and inconclusive. One serving of [name of the food or dietary supplement] provides [  ] gram(s) of EPA and DHA.

*Id.*

Fish oil—commonly found in a variety of fatty fish, including menhaden, sardines, anchovies, salmon, and tuna—is one of the main sources of Omega-3 fatty acids.  *Id.* ¶ 30.  Omega-3 fatty acids, which include EPA and DHA, exist naturally in a triglyceride form and can be synthetically made in an ethyl ester form.  *Id.* ¶¶ 33, 35.  Standard fish oil in the triglyceride

---

[3] A permalink for this site was not available.

3

1    form is "derived using a physical, rather than a chemical process," that is typically referred to as
2    the "wet reduction" method.  *Id.* ¶ 32 (citing Anthony P. Bimbo, *Marine Oils; Edible Oil*
3    *Processing*, AOCS Lipid Library, December 2016, available at https://lipidlibrary.aocs.org/edible-
4    oil-processing/marine-oils) (permalink: https://perma.cc/MN7K-J5WQ) (last accessed August 23,
5    2024) ("*Bimbo Article*").  During this process, oil is physically pressed out of cooked fish without
6    solvent extraction, yielding unrefined fish oil in the "triglyceride form."  *Id.*  At a molecular level,
7    fish oil in the triglyceride form contains lower concentrations of EPA and DHA compared to fish
8    oil in the ethyl ester form.  *Id.* ¶¶ 34, 38 (citing Peter Lembke, *Production Techniques for Omega-*
9    *3 Concentrates*, *in Omega-6/3 Fatty Acids. Nutrition and Health* (2013),
10   https://doi.org/10.1007/978-1-62703-215-5_19) (permalink: https://perma.cc/VP2W-9XLE).

11   By contrast, a chemical process of extracting fish oil, trans-esterification, was developed in
12   the 1980's.  *Id.* ¶ 35.  At a high-level, trans-esterification removes the glycerol backbone of EPA
13   and DHA, effectively freeing EPA and DHA molecules from the glycerol.  *Id.* ¶ 37 (citing
14   Douglas MacKay, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride*
15   *Form* (2007)) ("*MacKay Article*").[4]  EPA and DHA free fatty acids are subsequently re-esterified
16   with ethanol to form ethyl esters.  *Id.*  Additional steps, including a process called "molecular
17   distillation," then ensue.  *Id.*  Critically, the trans-esterification process "irrevocably transforms the
18   Omega-3's in fish oil from their natural triglyceride form into Omega-3 fatty acid ethyl esters."
19   *Id.* ¶ 41.  This process also yields a product with a substantially higher concentration of EPA and
20   DHA at a much lower cost.  *Id.* ¶ 35 (citing *Bimbo Article*).  Indeed, the SAC notes that the trans-
21   esterification process "enabled scientists to increase the yield of omega-3s from 30% to upwards
22   of 70%."  *Id*.

23   The molecular differences between DHA and EPA containing ethyl esters and triglycerides
24   are represented below:[5]

---

[4] The website link included in Hernandez's SAC to the *MacKay Article* did not work.  However, the Court was able to review the article because it was attached as Exhibit B to DTI's motion to dismiss.  *See* ECF No. 53-4.
[5] DHA-EE and EPA-EE refer to the ethyl-esterized versions of the molecules.

<(header)>
</(header)>

**DHA:**

**DHA-EE:**

**EPA:**

**EPA-EE:**



1  *Id.* at 14–15.[6]

2  To the untrained eye, the differences between the above-pictured molecules appear minute. Nonetheless, molecular-level differences exist between the molecules, as the DHA and EPA fatty acids in ethyl-ester form are "esterified to an ethanol backbone," while the DHA and EPA fatty acids in triglyceride form "are esterified to a glycerol alcohol backbone." ECF No. 53-4 at 3 (*Mackay Article*). Hernandez alleges that, in light of these molecular changes, fish oil and omega-3 fatty acid ethyl esters "are distinguishable on a molecular level such that it is impossible as a matter of law or logic for them to share a common or usual name." *Id.* ¶ 41. He further claims that, "[a]long with their molecular differences, [these substances] have different common or usual names which must be properly represented on labeling of any dietary supplement in which they are contained. To do otherwise is deceptive, misleading, fraudulent and illegal." *Id.*

One final note on the differences between the triglyceride and ethyl-esterified forms of DHA and EPA deserves mention. Neither Hernandez's SAC nor any of the scientific materials annexed to the complaint definitively claim that one form of DHA/EPA is superior to the other. The *MacKay Article* opines that "current research evidence points toward the triglyceride form for better absorption and assimilation." However, it ultimately concludes that "[m]ost consumers and health care professionals are unaware that there are two different delivery forms of these valuable nutrients," and that "the scarcity of data concerning the relative bioavailability of ethyl ester and triglyceride forms of EPA and DHA does not allow for definitive conclusions, and more research is warranted" regarding which form is better absorption and assimilation.

**C.   Causes of Action and Motion to Dismiss**

Hernandez's SAC sets forth seven causes of action, including unlawful, unfair, and fraudulent business practices under Cal. Bus. & Prof. Code §§ 17200, *et seq*. (Claims I–III); false

---

[6] The molecules can be found through the National Library of Medicine website, and at the following links (last accessed August 23, 2024):
https://pubchem.ncbi.nlm.nih.gov/compound/445580 (permalink: https://perma.cc/574N-F98G) (DHA); https://pubchem.ncbi.nlm.nih.gov/compound/9831416 (permalink: https://perma.cc/ANY8-JARH) (DHA-EE); https://pubchem.ncbi.nlm.nih.gov/compound/446284 (permalink: https://perma.cc/4FGX-HKKS) (EPA); and
https://pubchem.ncbi.nlm.nih.gov/compound/9831415 (permalink: https://perma.cc/JXH6-3TMK) (EPA-EE).

United States District Court
Northern District of California

advertising under Cal. Bus. & Prof. Code §§ 17500, *et seq.* (Claim IV); violation of the Consumers Legal Remedies Act under Cal. Civ. Code. §§ 1750, *et seq.* (Claim V); breach of express warranty (Claim VI); and restitution based on quasi-contract and unjust enrichment (Claim VII). Additionally, Hernandez requests an order certifying a class, appointing him as class representative, and appointing his counsel lead counsel for the class. DTI moves to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1).

## II.     JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1332(d)(2).

## III.    LEGAL STANDARD

### A.     Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal "is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. While this standard is not "akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In determining whether a plaintiff has met the plausibility requirement, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th

Cir. 2005). A plaintiff may "plead[ ] facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

### B. Rule 12(b)(1)

"Article III of the Constitution confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *Id*. (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). A defendant may attack a plaintiff's assertion of jurisdiction by moving to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004); *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).").

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id*. "The district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)[.]" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

## IV. MATERIALS CONSIDERED

### A. Judicial Notice

DTI requests that the Court take judicial notice of various excerpts from the 2013 FDA Food Labeling Guide. *See* ECF No. 53-3. Pursuant to Federal Rule of Evidence 201(b), courts may take judicial notice of any fact "not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Public

8

1    records and information on government agency websites are properly subject to judicial notice."

2    *Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1206 (N.D. Cal. 2017).  Because these

3    excerpts are taken from a government agency website not subject to reasonable dispute, the Court

4    grants DTI's request.

       **B.**     **Incorporation By Reference**

       Hernandez cited numerous documents in the footnotes of his SAC.  Under the doctrine of incorporation by reference, "a district court [may] consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the . . . pleadings.'" *Al-Ahmed v. Twitter, Inc.*, 603 F. Supp. 3d 857, 866 (N.D. Cal. 2022), *appeal dismissed*, No. 22-15914, 2022 WL 4352712 (9th Cir. July 7, 2022) (quoting *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).  The Court may incorporate such a document "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).  Therefore, the Court incorporates the documents that are referenced throughout the complaint and considers each in its entirety.

## V.    DISCUSSION

       Hernandez's complaint, at its core, is that DTI has pulled a "bait and switch" by referring to its trans-esterified Omega-3 product as "fish oil." *See* ECF No. 49 ¶ 40.  DTI responds that the product label does not deceive reasonable consumers, that Hernandez's claims regarding the product's name are preempted, that his other claims regarding statements on the label fail as a matter of law, and that he lacks standing to seek equitable and injunctive relief because he cannot allege an inadequate remedy at law and does not plausibly allege imminent future harm. *See* ECF No. 53 at 9.  The Court begins by addressing standing for equitable and injunctive relief.

       **A.**     **Standing for Equitable and Injunctive Relief**

            **1.**     **Equitable Relief**

       DTI asserts that Hernandez must demonstrate that he "lacks an adequate remedy at law" before securing equitable relief.  ECF No. 53 at 9 (quoting *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)).  Hernandez responds that *Sonner* does "not constitute controlling

authority prohibiting a federal court plaintiff from pleading alternative remedies," and at this juncture, he "should not have to choose his claim or remedy." ECF No. 56 at 26.

In *Sonner*, the Ninth Circuit held that "a federal court must apply traditional equitable principles before awarding restitution under the UCL and CLRA." 971 F.3d at 841. However, "[t]his Court, together with the majority of courts in this district, understands *Sonner* to require far less at the pleading stage." *In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1012 (N.D. Cal. 2023); *see Murphy v. Olly Public Benefit Corp.*, No. 22-cv-03760-CRB, 651 F.Supp.3d 1111, 1129 (N.D. Cal. Jan. 17, 2023) ("*Sonner* does not require Plaintiffs to 'demonstrate' anything at the pleadings stage. Plaintiffs alleged that legal remedies were not as certain as equitable remedies. That is sufficient.") (internal citation omitted); *Carroll v. Myriad Genetics*, No. 22-cv-00739-YGR, 2022 WL 16860013, at *6 (N.D. Cal. Nov. 9, 2022) ("*Sonner* does not address what a plaintiff must allege at the pleading stage in order to proceed on her equitable claims."); *Warren v. Whole Foods Mkt. Cal., Inc.*, No. 21-cv-04577-EMC, 2022 WL 2644103, at *9 (N.D. Cal. July 8, 2022) ("[The plaintiff] is not barred by *Sonner* . . . from pursuing alternative remedies at this early stage of the suit."); *Jeong v. Nexo Fin. LLC*, No. 21-cv-2392-BLF, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) ("There is no binding precedent that holds that pleading equitable restitution in the alternative is improper."); *Johnson v. Trumpet Behav. Health, LLC*, No. 3:21-cv-03221-WHO, 2022 WL 74163, at *3 (N.D. Cal. Jan. 7, 2022) ("[B]ecause *Sonner* was decided at a later posture, . . . if a plaintiff pleads that she lacks an adequate legal remedy, *Sonner* will rarely (if ever) require more this early in the case.").

Here, Hernandez pleads that he is entitled to "restitutionary disgorgement of the profits [that DMI] obtained from" the sale of its product. ECF No. 49 at 37. Critically, however, Hernandez fails to allege that he lacks an adequate legal remedy. Accordingly, Hernandez's claims for equitable relief are dismissed with leave to amend.

### 2. Injunctive Relief

Next, DTI alleges that Hernandez is not entitled to injunctive relief because he merely alleges that "under certain circumstances "he would consider" or "would be willing" to purchase the Product again in the future." ECF No. 53 at 22 (quoting ECF No. 49 ¶¶ 21, 87).

10

To seek injunctive relief, a consumer must allege that he (1) "will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although []he would like to," or (2) that he "might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as []he may reasonably, but incorrectly, assume the product was improved." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).

Here, Hernandez alleges that if he "has occasion to believe that [DMI's] marketing and labeling is truthful, non-misleading, and lawful, he would consider purchasing the Product in the future." ECF No. 49 ¶ 21; *see id.* ¶ 81 ("Plaintiff would be willing to purchase Defendant's Products again in the future should he be able to rely on Defendant's labeling and marketing as truthful and non-deceptive."). The Court finds this sufficient to confer standing for injunctive relief. *See, e.g.*, *Ruiz v. Celsius Holdings, Inc.*, No. 3:21-CV-00128-GPC(KSC), 2021 WL 5811264, at *3 (S.D. Cal. July 28, 2021) ("Because Plaintiffs are previously deceived consumers who would purchase Defendant's product in the future if the beverages were not misleadingly marketed, they have alleged standing to seek an injunction."); *Milan v. Clif Bar & Co.*, 489 F. Supp. 3d 1004, 1006 (N.D. Cal. 2020) (finding plaintiffs had standing to seek injunctive relief where they alleged that they "would purchase the challenged Clif Products in the future if they were in fact healthy").

Accordingly, DTI's motion to dismiss for lack of standing for injunctive relief is denied.

### B.     Preemption

Turning to the issue of preemption, Hernandez alleges that "fish oil is not the common or usual name of this product." ECF No. 49 at 22. DTI, however, contends that Hernandez's complaint is subject to express preemption because referring to the product as "omega-3 fatty acid ethyl esters" would not be "common, usual, simple, direct, or otherwise appropriate." ECF No. 53 at 15. In the alternative, DTI argues that Hernandez's claims are subject to conflict preemption because it would "be impossible for DTI to comply with both federal and state requirements under [Hernandez's] theory of liability." *Id.* at 17.

The Supremacy Clause of the United States Constitution empowers Congress to enact

11

1  legislation that preempts state law. *See Gibbons v. Ogden*, 22 U.S. 1, 211 (1824). "Federal
2  preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state
3  law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an
4  extent that it is reasonable to conclude that Congress left no room for state regulation in that field."
5  *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010). In determining whether certain claims are
6  preempted, the Court heeds the long-established presumption against preemption. *See Medtronic,*
7  *Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

### 1. Express Preemption

As relevant here, the Federal Food Drug and Cosmetic Act (the "FDCA") forbids the misbranding of foods and supplements by way of false or misleading labeling. 21 U.S.C. § 343; *see POM Wonderful, LLC v. Coca-Cola Co.*, 573 U.S. 102, 106 (2014). Specifically, the FDCA, as amended by the Nutrition Labeling and Education Act ("NLEA"), contains an express preemption provision, making clear that state laws imposing labeling requirements not identical to FDCA mandates are preempted. *See* 21 U.S.C. § 343–1(a).

FDCA regulations require a product to bear the name "required by any applicable Federal law or regulation; or, in the absence thereof, [t]he common or usual name . . . ; or, in the absence thereof, [a]n appropriately descriptive term[.]" 21 C.F.R. § 101.3(a)-(c); *see also* 21 U.S.C. §§ 341, 343(i)(1). A product's common or usual name must "accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients," and "may be established by common usage." 21 C.F.R. § 102.5(a), (d). Here, the parties do not contest that the name of the product at issue is not subject to a federal regulation, and thus, that the product must bear its "common or usual name." 21 C.F.R. § 101.3(a), (b)(1)-(2).

The Court finds that Hernandez's claims are not expressly preempted. Hernandez alleges that using the name "fish oil" for an Omega-3 fatty acid ethyl ester product is misleading because "[t]hey are different on a molecular level and have different common and usual names." Some of the authorities annexed to the SAC refer to both the triglyceride form and ethyl ester form as types of "fish oil." For example, the *MacKay Article* notes that one "study suggests that both ethyl esters of fish oil and triglycerides of fish oil were equally well absorbed when given in a liquid test

meal containing 27 g of EPA and DHA." ECF No. 53-4 at 4. Nonetheless, other authorities incorporated by reference to the SAC, such as the monographs published by the Global Organization for EPA and DHA Omega-3s ("GOED"), distinguish between "EPA and/or DHA Omega-3 Oil Ethyl Ester Concentrates" and fish oil. *Id.* ¶ 51 (citing GOED Voluntary Monograph, Version 8.2, January 6, 2022, available at https://goedomega3.com/goed-monograph) (permalink: https://perma.cc/XZ8A-EJBE) (last visited August 23, 2024). To paraphrase the reasoning of the Second Circuit in a fairly analogous case, "[t]hese sources may be evidence relevant to determining the common name of the product, if it has one, but standing alone they are not enough to establish the common name definitively. Ultimately, they do not provide a sufficient basis to conclude [Hernandez's] claims are preempted at this early stage in the litigation." *Baines v. Nature's Bounty (NY), Inc.*, No. 23-710-CV, 2023 WL 8538172, at *2 (2d Cir. Dec. 11, 2023).[7]

Therefore, in accepting all factual allegations in the complaint as true and construing the pleadings in the light most favorable to Hernandez, the nonmoving party, the Court concludes his claims are not expressly preempted by the FDCA.

### 2. Conflict Preemption

DTI's cursory arguments regarding conflict preemption are similarly unpersuasive.[8] Conflict preemption occurs when compliance with both federal and state laws is impossible, and when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hillsborough Cnty., Fla. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713 (1985) (internal quotations and citations omitted). DTI asserts that "federal law requires the Product bear its common or usual name," while Hernandez "alleges that the Product must be called something not common or usual." ECF No. 53 at 17. Thus, DTI contends, "[i]t would . . .

---

[7] Other courts have also declined to find false labelling claims preempted at the motion to dismiss stage, including *Corpuz v. Walmart, Inc.*, No. 3:22-CV-00901-RBM(AHG), 2023 WL 5154509, at *5 (S.D. Cal. Aug. 10, 2023) (declining "to make such a determination [about preemption] at this juncture.") and *Rodriguez v. Target Corp.*, No. 22 CIV. 2982 (LGS), 2022 WL 18027615, at *5 (S.D.N.Y. Dec. 30, 2022) (holding that "the Court cannot weigh the evidence or choose between competing inferences at the motion to dismiss stage.").

[8] DTI does not even address conflict preemption in its reply brief.

13

be impossible for [it] to comply with both federal and state requirements under [Hernandez's] theory of liability." *Id.* For the reasons set forth in the preceding section on express preemption, the Court concludes that the common or usual name of the product has not been definitively established. Accordingly, conflict preemption is not appropriate.

### C. Reasonable Consumer

Because the Court concludes that Hernandez's claims are not preempted at this early stage of the litigation, the Court turns to the merits of his claims. DTI moves to dismiss Hernandez's claims on ground that the product label at issue is not likely to deceive a reasonable consumer.

Under California's Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumers Legal Remedies Act ("CLRA"), "claims based on deceptive or misleading marketing must demonstrate that a 'reasonable consumer' is likely to be misled by the representation." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021) (citing *Ebner v. Fresh Inc.*, 838 F.3d 958, 965 (9th Cir. 2016)). "This standard is higher than a 'mere possibility' that the statement at issue 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" *Amin v. Subway Restaurants, Inc.*, No. 21-CV-00498-JST, 2022 WL 20184652, at *3 (N.D. Cal. July 7, 2022) (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003)). "Rather, the standard requires a likelihood 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Id.* (quoting *Lavie*, 105 Cal. App. 4th at 508). "Indeed, a plaintiff's unreasonable assumptions about a product's label will not suffice." *Moore*, 4 F.4th at 882 (citing *Becerra v. Dr. Pepper/Seven Up., Inc.*, 945 F.3d 1225, 1229–30 (9th Cir. 2019)).

While the Ninth Circuit has made clear that granting a motion to dismiss is appropriate only in "the rare situation" where "it impossible for the plaintiff to prove that a reasonable consumer was likely to be deceived," the Court finds this is one of such situations. *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 939 (9th Cir. 2008). Hernandez alleges that because DTI's product has undergone a change at the molecular level (namely, esterification), the product may no longer bear the name "fish oil." ECF No. 49 ¶ 40. To bolster these claims, he references a litany of scientific articles, molecular structures, and mass spectra findings that delineate the molecular

14

differences between Omega-3s in the triglyceride and ethyl-ester form. But the complaint is devoid of factual allegations that demonstrate that average, reasonable consumers would believe an Omega-3 supplement must explain when it contains DHA/EPA esterified to a glycerol backbone, and when it does not.[9] No doubt, molecular differences between triglyceride and ethyl-ester Omega-3s exist. However, to paraphrase our sister circuit, the complaint must "provide [] supporting allegations that make it plausible that consumers who purchase [DTI's] product are actually thinking about the molecular form of their fish-oil-derived omega-3s at all." *Baines*, 2023 WL 8538172, at *2. And finally, even if "some consumers" are aware of these molecular distinctions, DTI's label cannot be deemed "false and deceptive merely because [it] may be 'unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons' that may purchase the product." *Ebner*, 838 F.3d at 966 (quoting *Lavie*, 105 Cal. App. 4th at 508).

In his opposition, Hernandez asserts that determining "what a reasonable consumer would believe is rarely an appropriate subject for a motion to dismiss." ECF No. 56 at 17. While true, the reasonable consumer standard is also not without limits. Whether a reasonable consumer is likely to be deceived demands "more than a mere possibility that the [product] might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner." *Lavie.*, 105 Cal. App. 4th at 508. Courts have not hesitated to dismiss consumer fraud claims in appropriate circumstances where allegedly deceptive advertisements would not have misled a reasonable consumer. *See, e.g.*, *Lee v. Mikimoto (Am.) Co.*, No. 22-CV-01923-PAC, 2023 WL 2711825, at *6 (S.D.N.Y. Mar. 30, 2023) (dismissing plaintiff's claim on the basis that "[c]ourts have repeatedly rejected that reasonable consumers are even aware of specialized standards, let alone

---

[9] The closest the SAC gets is this sentence from Paragraph 7:

> Critically, the trans-esterification process eliminates the majority of natural fish oil's constituent ingredients and substantially transforms its Omega-3 triglycerides into ethyl esters – a substance that is materially distinct from the fish oil reasonably expected by consumers and is something not found anywhere in nature.

ECF 49 ¶ 7.

15

that they rely on them in their day-to-day marketplace expectations."); *Lederman v. Hershey Co.*, No. 21-CV-4528, 2022 WL 3573034, at *4 (N.D. Ill. Aug. 19, 2022) (concluding that "even if the reasonable confectionery expert deems milkfat essential to fudge, Plaintiff has not shown that the reasonable 21st century consumer has the same expectations."); *Clark v. Westbrae Nat., Inc.*, No. 20-CV-03221-JSC, 2021 WL 1580827 at *2 (N.D. Cal. Apr. 22, 2021) (holding that "there is nothing about the word 'vanilla' itself which suggests to the reasonable consumer that the flavor comes *exclusively* from the vanilla bean."); *Sibrian v. Cento Fine Foods, Inc.*, 19-CV-0974 (JS) (ST), 2020 WL 3618953, at *4 (E.D.N.Y. July 2, 2020) (rejecting plaintiff's false labelling claims because "while there may be 'some few consumers' who expect that a San Marzano tomato must be certified by the Consortium . . . drawing upon common sense and common experience, [] the vast majority of reasonable consumers expect no such thing.)

In sum, the Court concludes that Hernandez has not pled plausible claims for violations of the UCL, FAL, or CLRA, and it dismisses these claims with leave to amend.

### D. Express Warranty and Unjust Enrichment Claims

Hernandez's claims for breach of express warranty and unjust enrichment are also premised on the false or misleading nature of DTI's product labeling. Dismissal of Hernandez's false labeling claims on the grounds set forth above disposes of the remainder of his claims for breach of express warranty and unjust enrichment. *See Wallace v. Wise Foods, Inc.*, 20-CV-6831, 2021 WL 3163599, at *3 (S.D.N.Y. July 26, 2021) (holding that dismissal of false labeling claims as implausible requires dismissal of express warranty and unjust enrichment claims); *cf. Ham v. Hain Celestial Grp., Inc.*, 70 F. Supp. 3d 1188, 1195 (N.D. Cal. 2014) (denying motion to dismiss breach of express warranty claim "for the same reasons as the consumer protection and misrepresentation-based claims."). Hernandez's claims for breach of express warranty and unjust enrichment are likewise dismissed with leave to amend.

### E. Other Claims

#### 1. Failure to List All Ingredients in Supplemental Facts Section

Hernandez claims that "[s]upplement manufacturers are generally required to disclose all ingredients contained in their products." ECF No. 49 ¶ 67. The parties agree that 21 C.F.R.

§101.36(b)(3)—which governs "[i]nformation on dietary ingredients for which [reference daily intakes] and [daily reference values] have not been established—applies to the product at issue.

DTI emphasizes that its product complies with this regulation because "[t]he constituents of a dietary ingredient . . . *may* be listed," but this is not a per se requirement. 21 C.F.R. § 101.36(b)(3)(iii) ("The constituents of a dietary ingredient . . . *may* be listed indented under the dietary ingredient and followed by their quantitative amounts by weight per serving[.]" (emphasis added). Hernandez's opposition neither references any statutory provision to the contrary nor does it cite any relevant caselaw. Accordingly, the Court agrees with DTI that it is not required to include every constituent of a dietary ingredient in its supplemental fact panel, and it dismisses this claim with prejudice.

### 2. Supplement Fact Panel Is False and Misleading

Next, Hernandez alleges that that there is an "obligation to describe [] ingredients by their common or usual name . . . in the Supplement Fact section," and that DTI breaches this obligation by "erroneously" listing EPA and DHA on its product. ECF No. 49 ¶ 67. In support of this assertion, Hernandez broadly cites to 21 C.F.R. §101.36, but includes no specific subsections.

In moving to dismiss, DTI claims that federal regulations do not require that constituents of dietary ingredients, such as EPA and DHA, bear their common or usual names. "Rather, only those '[i]ngredients *required* to be declared on the label . . . shall be listed by common or usual name[.]'" ECF No. 53 at 18 (quoting 21 C.F.R. § 101.4(a)(1)) (emphasis added). As set forth above, constituent ingredients are not required in the supplemental fact panel. *See* 21 C.F.R. § 101.36(b)(3)(iii). Once again, Hernandez's opposition fails to cite any authority to the contrary. Accordingly, the Court agrees with DTI that its supplement fact panel is neither false nor misleading, and it dismisses this claim with prejudice.

### 3. Triple Strength

Finally, Hernandez alleges that the product label falsely claims to be "Triple Strength." ECF No. 49 ¶ 74. He states that "[w]hile comparative nutrient content claims are generally allowed, they require notice of the comparable product[,]" and that DTI "fails to identify such a product." *Id.* ¶ 75. In support of this assertion, Hernandez broadly cites to 21 U.S.C. § 343.

17

DTI argues that Hernandez has "not identified any specific statute or regulation that requires DTI to identify a comparable product in order to make its 'Triple Strength'" claim. ECF No. 53 at 19. Hernandez clarifies in his opposition that he is asserting a claim under 21 C.F.R. 101.13(q)(3)(ii)(B). True, courts need not consider a claim where a plaintiff fails to identify the particular statute(s) upon which the claim is based in the complaint. *See Cecil Campbell v. Rushmore Loan Mgmt. Servs., LLC*, No. 8:20-CV-01695-MCS(JDE), 2021 WL 3284816, at *3 n.2 (C.D. Cal. Jan. 3, 2021) (dismissing claim where plaintiff's "theory [was] not expressly presented in the Complaint."); Fed. R. Civ. P. 8(a) ("A pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief."). Even assuming that this claim is properly plead, however, it still not sufficient to survive a motion to dismiss. Stated in full, 21 C.F.R. 101.13(q)(3)(ii)(B) reads:

> Whenever a statement is made that characterizes the percentage level of a dietary ingredient for which there is no RDI or DRV and the statement draws a comparison to the amount of the dietary ingredient in a reference food, the reference food shall be clearly identified, the amount of that food shall be identified, and the information on the actual amount of the dietary ingredient in both foods shall be declared in accordance with paragraph (j)(2)(iv) of this section (e.g., "twice the omega-3 fatty acids per capsule (80 mg) as in 100 mg of menhaden oil (40 mg)").

For this statute to apply, there must be a comparison to a "reference food." As DTI points out, the product label at issue does not include a reference food, and Hernandez has "not identified any specific statute or regulation that requires DTI to identify a comparable product in order to make its 'Triple Strength' claim." ECF No. 57 at 13. The Court therefore finds that DTI's "Triple Strength" claims are neither vague nor misleading. Because the Court concludes that amendment of this claim would be futile, it dismisses this claim with prejudice.

## CONCLUSION

For the foregoing reasons, DTI's motion is denied in part and granted in part. The Court finds that Hernandez has not adequately alleged that he is entitled to equitable relief; however, his claims for injunctive relief are otherwise sufficient. In addition, the Court finds that Hernandez's claims are not preempted. Hernandez's claims under the UCL, FAL, CLRA, as well as his claims for breach of express warranty and unjust enrichment, are dismissed with leave to amend.

18

Hernandez's remaining claims—that DTI fails to list all ingredients, that its supplemental fact section is misleading, and that its "triple strength" claim is misleading—are dismissed with prejudice.

Hernandez may file an amended complaint within twenty-eight days of this order solely to cure the deficiencies identified by this order. Failure to file a timely amended complaint will result in dismissal of his claims with prejudice.

**IT IS SO ORDERED.**

Dated: August 26, 2024



JON S. TIGAR
United States District Judge